IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

RONALD BRANNON
o/b/o CHARLOTTE BRANNON,

      Plaintiff,

v.                                                    CASE NO. 1:16-cv-46-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,[1]

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff brings this appeal on behalf of Charlotte Brannon, a Social

Security claimant who passed away on January 3, 2015.  The claimant will

hereafter be referred to as the "Plaintiff".  Plaintiff appeals from a final

decision of the Commissioner of Social Security ("the Commissioner")

denying her application for disability insurance benefits.  ECF No. 1.[2]   The

Commissioner has answered, and both parties have filed briefs outlining

_____

[1]Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 23, 2017. Accordingly, pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill
should be substituted for former Acting Commissioner of Social Security, Carolyn W.
Colvin, as Defendant in this matter. The Clerk is directed to correct the docket
accordingly.

[2]Plaintiff also sought SSI benefits, but that claim is not at issue in this appeal.

their respective positions.  ECF Nos. 11, 24, 28.  For the reasons

discussed below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

The procedural history of this case is summarized in the October 23,

2015, decision denying DIB.  R. 1212-37.  Plaintiff initially filed her

application on May 14, 1997, alleging disability beginning on April 1, 1997.

Plaintiff met the insured status requirements of the SSA through June 30,

1998.  Plaintiff's application was denied initially and upon reconsideration.

On April 15, 1999, an ALJ issued an unfavorable decision.  That decision

was subsequently remanded by the Appeals Council on June 6, 2002.

Following a second hearing, the ALJ again denied Plaintiff's application.

The Appeals Council denied review, and Plaintiff appealed to the United

States District Court for the Middle District of Florida.  The case was

remanded for further consideration of the opinion of Plaintiff's treating

physician, Dr. McCarthy.

In the meantime, Plaintiff filed subsequent applications for SSI and

DIB.  On July 21, 2006, a third hearing was held on her applications.  In a

partially favorable decision, the ALJ found that Plaintiff was disabled as of her fiftieth birthday on November 18, 2001.  However, the ALJ found that she was not disabled prior to her date last insured on June 30, 1998, for purposes of her application for DIB.  The Appeals Council remanded for further proceedings on September 16, 2008, because the claim file and hearing tape could not be located.  Plaintiff and her representative failed to appear for another ALJ hearing, and the ALJ dismissed the application. The Appeals Council vacated the dismissal but denied review of the 2006 partially favorable decision.  The USDC for the Northern District of Florida remanded for further proceedings and consideration of Dr. McCarthy's opinion. *See Brannon v. Astrue*, Case No. 1:11-cv-273-CAS (consent) (N.D. Fla. 12/19/12).

On remand, a video hearing was held on September 24, 2015, at which a medical expert, a psychological expert, and a vocational expert testified.  On October 23, 2015, the  ALJ found Plaintiff not disabled from her alleged onset date of April 1, 1997, through her date last insured, June 30 1998.  R. 1212-37.  The Appeals Council denied review.

This appeal followed.  Plaintiff asserts one issue for review:  The ALJ should have found Plaintiff disabled at Step 5 because substantial evidence shows she could not maintain full-time employment.  Plaintiff argues that the "only real question" at issue in this appeal is whether prior to Plaintiff's date last insured, her impairments would have resulted in the inability to work full-time without an unacceptable number and length of break periods.  Plaintiff contends that the treating physicians in the 1990s believed that Plaintiff's impairments made full-time employment impossible. ECF No. 24.

## II.  <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

---

[3] *See* 42 U.S.C. § 405(g) (2015).

[4] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

---

580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

5

impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10] First, if a claimant is working at a substantial gainful activity, he is not disabled.[11]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[12]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

---

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2015 version unless otherwise specified.).

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

[12] 20 C.F.R. § 404.1520(c).

1, he is disabled.[13]  Fourth, if a claimant's impairments do not prevent him

from doing past relevant work, he is not disabled.[14]  Fifth, if a claimant's

impairments (considering his residual functional capacity ("RFC"), age,

education, and past work) prevent him from doing other work that exists in

the national economy, then he is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff.[16]  The burden then temporarily

shifts to the Commissioner to demonstrate that "other work" which the

claimant can perform currently exists in the national economy.[17]  The

---

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[17] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[19]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of

---

for in the statutes or regulations.) (Internal citations omitted).

[18] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[19] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[20] Walker, 826 F.2d at 1003.

jobs in the national economy that the claimant can perform.[21]   Such

independent evidence may be introduced by a Vocational Expert's ("VE")

testimony, but this is not the exclusive means of introducing such

evidence.[22]   Only after the Commissioner meets this burden does the

burden shift back to the claimant to show that he or she is not capable of

performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A.  Findings of the ALJ

The ALJ found that Plaintiff had the severe impairments of: an

undifferentiated connective tissue disorder; possible seronegative

rheumatoid arthritis (RA) with an underlying fibromyalgia overlap;

myofascial pain; mild degenerative cervical spondylosis; and mild

degenerative disc disease at L4-L5.  The ALJ found that Plaintiff's severe

impairments did not meet or medically equal a listed impairment.  R. 1215-

20.

---

[21] Wolfe, 86 F.3d at 1077-78.

[22] *See id.*

The ALJ determined that Plaintiff retained the residual functional capacity for less than a full range of light work, with postural and environmental limitations.   In determining Plaintiff's RFC, the ALJ afforded the greatest weight to the opinion of the medical expert who had the benefit of all of Plaintiff's records and who testified at the hearing, Dr. Brown.  The ALJ concluded that Dr. Brown's opinion was consistent with the opinions of two treating physicians, Dr. Gompf and Dr. Zakem, and with the opinion of the agency medical consultant.  The ALJ gave little or less weight to the opinion of Plaintiff's treating physician, Dr. McCarthy.  The ALJ determined that Dr. McCarthy's opinion that Plaintiff could not work due to lupus was conclusory and did not explain actual work-related limitations or why such condition precluded Plaintiff from all work activity. The ALJ concluded that Dr. McCarthy "provided no credible medical rationale" for his opinion that Plaintiff was unable to work.  Further, the other evidence of record called Plaintiff's diagnosis of lupus into question. The ALJ also found Plaintiff's allegations to be not fully credible.   R. 1232-35.

Based on this RFC assessment and the testimony of a vocational expert (VE) at the hearing, the ALJ determined that Plaintiff could not perform her past relevant work as a corrections officer and gate guard. Based on her age, education, work experience, and RFC, the ALJ found that there were unskilled jobs that existed in significant numbers in the national economy that Plaintiff could have performed, such as Route Clerk, Ticket Seller, and Surveillance Systems Monitor. The ALJ therefore found that Plaintiff was not disabled. R. 1236-37.

## B. Medical Evidence

Plaintiff's brief on appeal summarizes or mentions records from the following sources: Dr. McIlwain, Dr. Clement, Dr. Beams, Dr. Rozboril, Dr. McCarthy, Dr. Hamlin (consultant), Dr. Fried (consultant), Dr. McGregor (consultant), the Watson Clinic, and Dr. Gompf. ECF No. 24 at 13-19.

In October 1993, Dr. McIlwain assessed Plaintiff with chronic polyarthritis, most likely RA. Plaintiff described pain, stiffness, and swelling in her hands, wrists, elbows, shoulders, knees, ankles, feet, neck, and lower back. She described having difficulties with activities of daily living such as using her foot to push a gas pedal, pain in the feet when walking,

11

and difficulty opening jars. Notes from June 1994 reflect that Plaintiff felt she could work if not for joint pain. Dr. McIlwain prescribed continued heat and exercise, and started Plaintiff on azulfidine and prednisone. R. 314, 315-17.

Dr. C. Bruce Clement treated Plaintiff during 1996-97. On her October 9, 1996, initial visit, Plaintiff presented in no acute distress but complained of pain all over, chronic fatigue, and poor sleep. Plaintiff reported that she worked in a school lunchroom and smoked a pack of cigarettes per day. Dr. Clement noted multiple tender points on the back of the neck, trapezius ridge, and parascapular areas. Her spine moved fairly well, and she had good range of motion of the left hip and moderately limited range of motion of the right hip, accompanied by pain and tenderness. Knees, ankles, and toes were unremarkable. Dr. Clement's impression was history of RA, "probable fibromyalgia", and thyromegaly. Plaintiff was prescribed medication and counseled on fibromyalgia. R. 189-91.

In November 1996, Plaintiff reported that she was not doing very well. X-rays showed some erosions of the hands and mild degenerative

12

changes of the cervical spine.  Her antinuclear antibody (ANA) test was

positive, and her sedimentation rate was slightly elevated.  RA factor was

negative.  Dr. Clement's impression was likely seronegative erosive RA,

but Plaintiff would have be examined for other connective tissue disease

such as an overlap versus lupus, and fibromyalgia.  R. 188.

In December 1996, Dr. Clement again assessed fibromyalgia and

probable seronegative erosive RA.  R. 183.  On a follow-up visit, Plaintiff

continued to complain of pain and poor sleep.  She had trace synovitis in

her hands and knees; wrists, elbows, and shoulders were unremarkable.

Dr. Clement identified multiple tender points in the neck and shoulder

girdle.  He opined that her fibromyalgia may be flared.  Subsequent testing

identified a moderate degree of osteoporosis of the lumbar spine and

moderately severe osteopenia of the left hip and femoral neck.  Dr.

Clement had been treating Plaintiff with gold injections, but that was

stopped after she developed a rash.  R. 172-74, 182, 195.  In early 1997,

Plaintiff complained of significant aches and pains.  *Id*.

Plaintiff began treating with Dr. McCarthy, a rheumatologist, in June

1997.  His examination revealed slight pain without swelling in the wrists,

13

no rheumatoid nodules above the elbows, achilles, or cervical spine region, somewhat limited flexion and extension of the lumbar spine, some tenderness of the sacroiliac area, and minimal synovial hypertrophy about each knee but without warmth or erythema.  R. 233.  Plaintiff expressed dissatisfaction that Dr. Clement was not willing to prescribe stronger pain medication, and Dr. McCarthy advised that pain management evaluation may be in order.  He ordered diagnostics and scheduled a follow-up.  R. 234.  At the follow-up appointment in July, there was no change in the detailed joint examination.  Plaintiff was started on Lortab for pain and other medications.  R. 229.

In July 1997, Dr. Jeanne M. McGregor, M.D., performed a consultative examination.  Dr. McGregor concluded that Plaintiff showed mild signs of depression but her depression was controlled fairly well and did not significantly impair her ability to function.  Dr. McGregor noted that some patients with fibromyalgia can do routine activities on a scheduled basis no more than two or three days per week, depending on the patient, and some are able to work full time.  Based on her physical examination, she opined that Plaintiff could handle activities which are sedentary to light work, with limitations on heavy lifting.  R. 220-23.

14

In August 1997, Dr. McCarthy completed an assessment for the Office of Disability Determination noting that Plaintiff had full range of motion in her back, normal gait, did not require a hand-held assistive device, did not have atrophy or sensory loss of her lower extremities, did not have abnormalities of the hands, and was able to perform basic grasping bilaterally.  He noted that Plaintiff had myalgias and tender muscles associated with fibromyalgia.  R. 228.

Plaintiff saw Dr. Rozboril, another rheumatologist, in September-October 1997.  At the first visit, his impression was polyarthritis, inflammatory, with a diagnosis of RA, fibrositis, and osteoarthritis.  The treatment plan included Flexeril to decrease muscle pain and improve sleep, and Vicodin.  On a follow-up visit, Dr. Rozboril noted "clinical picture more suggestive of RA today."  Plaintiff was switched to Oxycontin.  At the end of October 1997, Dr. Rozobil suggested a physical therapy referral for massage and rehabilitation, and increased Plaintiff's Oxycontin.  R. 246-49.

Plaintiff treated with Dr. Sandra Gompf with the Watson Clinic from December 1997 to March 1998 for various health complaints.  Dr. Gompf's assessment was history of diagnosis of RA, fibromyalgia/chronic pain,

15

degenerative joint disease, and osteoporosis.  Dr. Gompf noted that

Plaintiff was treated by several rheumatologists for the past several years,

and would be referred to Rheumatology for further follow up.  R. 259-67.

Plaintiff saw Dr. Randel Miller, a rheumatologist with the Watson

Clinic, in February 1998.  Dr. Miller noted that Plaintiff had a history

compatible mostly with underlying fibromyalgia/fibrositis syndrome but that

"[w]e could really detect no evidence of any inflammatory arthropathy at

this time . . . [w]e could not detect much in the way of any significant active

inflammation at this time."  He felt that Plaintiff could benefit from use of a

nonsteroidal anti-inflammatory medication, as well as continuing to use

muscle relaxants and antidepressants for underlying fibromyalgia which

would work as well.  R. 254-58.

In March 1998, Plaintiff expressed to Dr. Gompf that she was not

interested in seeing a rheumatologist again and did not desire further

evaluation of her inflammatory arthropathy.  Plaintiff was taking Vicodin ES

every 4 to 6 hours, which Dr. Gompf had advised against.  Her treatment

plan included a trial of EC Naprosyn and refill of Vicodin with advice not to

use it more often than every six to eight hours for severe pain.  Plaintiff

was referred to Dr. Stewart Grief for depression and chronic pain

management, which Dr. Gompf emphasized was very important.  R. 251-53.

In June 1998, Dr. Michael C. Burnette, a rheumatologist with Tampa Medical Group, noted that Plaintiff had polyarthritis with a positive ANA and "this could represent early lupus."  R. 435.  However, in June 1998, Dr. Burnette stated that he believed Plaintiff had seronegative RA.  Her x-rays were unremarkable and showed no evidence of erosive disease.  R. 434.

In July 1998, Plaintiff returned to Dr. McCarthy, and presented as very fatigued and with a "diagnosis of clear cut lupus by Dr. Burnette".  On physical examination, there was no change in the detailed joint examination with the exception of some tenderness in the metacarpophalangeal (MCP) joints and proximal interphalangeal (PIP) joints which Dr. McCarthy found "somewhat surprising for this time of the day with warmth in these areas."  His diagnostic impressions included active lupus, costochondritis, osteoporosis, and fibrositis.  R. 426-27.   In September 1998, Dr. McCarthy observed no active arthroscopy with no synovitis.  His notes state "[w]e resist the patient's multiple pleadings to give her tranquilizers and medications for migraines and anti-

depressants[.]" Plaintiff was advised to call her psychiatrist. She was continued on medications, including Vicodin. R. 422.

Dr. McCarthy completed a form letter for Plaintiff's disability counsel in October 1998, noting that Plaintiff's symptoms included multiple joint pain and that her diagnosis was systemic lupus erythematosus, based upon diagnostic testing and clinical findings. Dr. McCarthy opined that Plaintiff was unable to perform full-time work because of limitations which he described as "active [lupus], possible seronegative rheumatoid disease, osteoarthritis, and depression." R. 421. He also submitted a letter noting that Plaintiff was seen initially on referral in June 1997 for concerns regarding a recent lupus diagnosis, and that her previous diagnosis of rheumatoid disease had changed to lupus. He noted that Plaintiff had a history of positive ANA, alopecia, and arthritis along with muscle and joint pain. Her positive ANA along with a high-normal sedimentation rate was felt to represent evidence to support a diagnosis of lupus. R. 419.

In December 1998, Plaintiff underwent a consultative examination by Dr. Jerald M. Zakem, M.D., a rheumatologist. Dr. Zakem's physical examination revealed diffuse tender areas to palpation in both articular and nonarticular areas. Plaintiff had full range of motion of all joints, but with

pain.  Straight leg raising was positive to 90 degrees bilaterally.  She had

no significant paravertebral spasm or tenderness.  Her gait was within

normal limits, as were hand grip and dexterity.  She was able to stand on

heels and toes, except in a deep knee bend.  His assessment was chronic

pain syndrome compatible with fibromyalgia, with no evidence to suggest

active arthritis, and migraine headache.  Dr. Zakem completed a medical

source statement concluding that Plaintiff could occasionally lift/carry 20

pounds, frequently lift/carry 10 pounds, stand for four hours in an eight-

hour workday, sit for an unlimited period, and occasionally climb, balance,

stoop, crouch, kneel, and crawl.  Plaintiff had no limitations in reaching,

handling, feeling, pushing/pulling, seeing, hearing, or speaking.  She had

no environmental restrictions except for moving machinery and heights due

to medication.  R. 330-34.

In May 1999, Dr. McCarthy submitted another letter to Plaintiff's

counsel, noting that Plaintiff's condition had not improved and that she

continued on medication for lupus, "although other observers may choose

to differ" on the basis of her ANA and other results.  Dr. McCarthy noted

that Plaintiff had symptomology in terms of myalgias and arthralgias with

concomitant diagnoses of possible fibrositis and seronegative rheumatoid

19

disease (overlap).  She also had documented osteoarthritis, osteoporosis,

depression, and hypercholesterolemia.  He concluded that Plaintiff had

increased symptomology with physical activity so "any activity involving

heavy lifting or significant physical exertion activity should be avoided."  R.

408.  Plaintiff continued treating with Dr. McCarthy.  Ultimately, he

diagnosed Plaintiff with undifferentiated connective tissue disease rather

than lupus.  *See* R. 389.

Plaintiff's medical records include a diagnosis of major depression in

1994 by Dr. Arthur Hamlin, Psy. D, during a consultative examination.  R.

318-23.  Dr. Hamlin noted that Plaintiff's "medical status has prevented her

from returning to work and it remains highly questionable whether she will

be employable in the near future."  R. 323.  Plaintiff saw a psychiatrist, Dr.

Jeffrey Beams, in April - June 1997.  Dr. Beams also diagnosed Plaintiff

with major depression.  R. 212-19.  In June 1998, consultative examiner

Dr. Joel B. Freid, Ph.D., also diagnosed major depression, but concluded

that Plaintiff would be able to manage her funds independently.  R. 272-75.

In mid-June, 1998, Dr. Gompf assessed Plaintiff as actively

suicidal/severely depressed, and noted that she would be transported for

inpatient admission to a psychiatric facility.  R. 337.  There are no records

reflecting such admission, however.

### C.  Summary of Hearing Testimony

Plaintiff's counsel appeared at the September 24, 2015, hearing on

her behalf.  Three experts testified: Dr. David Brown, a board certified

internist and rheumatologist, Dr. Paul Wiese, a licensed clinical

psychologist, and Mr. Charles Heartsill, a VE.  R. 1665-1717.

After summarizing Plaintiff's medical history, the ALJ asked Dr.

Brown specifically about Dr. McCarthy's October 1998 opinion that Plaintiff

was unable to work full-time due to lupus, possible seronegative

rheumatoid disease, osteoarthritis, and depression.  Dr. Brown testified

that according to Plaintiff's records, she was being treated by another

rheumatologist at that time, Dr. Miller, as well as by Dr. Gompf.  Plaintiff's

serological results showed that her ANA stayed in the same range,

rheumatoid factor was negative, and sedimentation rates were

unremarkable.  Dr. Miller's x-ray evaluations showed only an early mild

degenerative condition in Plaintiff's hands.  Dr. Clement's treatment and

records reflect a condition consistent with undifferentiated or seronegative

RA, which was treated with gold therapy (injections).  Dr. Brown testified

that the medical records did not present evidence of a progressive inflammatory arthropathy, and Plaintiff's serological markers (the ANA) may have been a false positive or low titer associated with her hypothyroid disease and not with lupus.  Dr. Brown testified that there was no evidence of significant target organ involvement that would be consistent with a diagnosis of lupus.  Dr. Brown explained that Dr. McCarthy's diagnosis of lupus was based in part on Plaintiff's history of diffuse alopecia (hair loss), but that Plaintiff was on other medications associated with alopecia, in particular the gold therapy which commonly caused alopecia.  R. 1675-76.

Dr. Brown further testified that Plaintiff did not present any of the other recognized major criteria for lupus, such as butterfly rashes, systemic rashes, or photosensitivity in areas exposed to rash, and no renal involvement.  He concluded that he would find it "highly unlikely" that Plaintiff had lupus versus an undifferentiated connective tissue disease, low-grade synovitis, and evidence of a seronegative RA.  R. 1677.  Dr. Brown testified that none of Plaintiff's conditions were sufficient to meet or equal a listed impairment.  R. 1678.

With respect to Plaintiff's RFC, Dr. Brown testified that the medical records supported a conclusion that Plaintiff could occasionally lift up to 20

22

pounds, frequently lift up to 10 pounds, stand and walk up to six hours combined, and sit up to six hours. She did not require any assistive devices. She had no limitations on gross handling, but was limited to occasional repetitive use of her hands. He assessed no limitations on reaching, and no postural limitations. Plaintiff's records reflected a history of asthmatic bronchitis and tobacco use, so exposure to dust, fumes, and chemicals should be limited. Her rheumatological condition would limit exposure to extreme temperatures. She would also be precluded from working at unprotected heights or with dangerous equipment or machinery. R. 1679-81.

Dr. Wiese testified that Plaintiff's records of mental health treatment did not reflect that she sought such treatment from May 1997 until the middle of June 1998. There were no acute exacerbations notable for a severe disorder, and her symptoms appeared secondary to her physical conditions. Dr. Wiese opined that there was no evidence that Plaintiff had a recognizable mental condition during the relevant time period. He conceded on cross-examination that in mid-June 1998, Dr. Gompf

assessed Plaintiff as severely depressed and requiring inpatient treatment. R. 1690-96.

The VE testified that, given the RFC assessed by the ALJ and Plaintiff's age, education and work experience, there were unskilled positions that Plaintiff could perform such as route clerk, ticket seller, and surveillance system monitor, all of which existed in significant numbers in the national economy.  R. 1713-14.

In her previous hearing, Plaintiff testified that she was born on November 18, 1951, had a high school education, and last worked as a substitute in school lunchrooms in March 1994.  At that time, she helped cook, washed dishes, served food, and cleaned.  She stopped due to back pain caused by osteoporosis in her spine.  Prior to that, she worked as a security guard.  Plaintiff was being treated for a thyroid problem, high blood pressure, RA, and lupus, but was not receiving any mental health treatment.  Plaintiff testified that she could do very little in a typical day due to pain.  She washed dishes but did not do other housework.  She drove only when necessary, cooked occasionally, and had trouble walking.  She did not pick up more weight than a gallon of tea.  She could watch TV or

read a little.  In addition to the medications for her medical conditions, she took an anti-depressant and Valium when she needed it.  R. 1176-89. Plaintiff's husband also testified that during late 1997 and early 1998, Plaintiff was able to do very little, was in constant pain, and had difficulty sleeping.  *Id*. at 1198-1202.

## IV. <u>Discussion</u>

Plaintiff essentially contends that the RFC determined by the ALJ does not account for her asserted inability to maintain a full-time work schedule during the relevant period (between her onset date of April 1, 1997, and her date last insured of June 30, 1998) due to her need for an unacceptable number and length of break periods over the course of the workday.  ECF No. 24 at 28.  She argues that "treating physicians in the 1990s believed that [her] physical pain and mental health issues resulted in a combination of impairments that would have made full-time employment . . . impossible."  *Id*.  The Court construes this argument as challenging the ALJ's rejection of Dr. McCarthy's opinion that Plaintiff was unable to work

due to her diagnoses of lupus, possible seronegative rheumatoid disease, osteoarthritis, and depression.[23]

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[24]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[25]  To determine the weight to be accorded a treating physician's opinion, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1527(d), which include the length of treatment, frequency of examination, nature and extent of the

---

[23]Plaintiff does not, however, challenge the ALJ's finding that her mental condition was non-severe.

[24] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[25] 20 C.F.R. § 404.1527(d)(2).

treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the records as a whole, and specialization of the treating physician.

While there is no requirement for the ALJ to discuss every medical record in the administrative record, he is "required to state with particularity the weight he gave the different medical opinions and the reasons therefor."[26]  Additionally, because an ALJ is not permitted to substitute his judgment for that of the medical experts,[27] the ALJ cannot reject portions of a medical opinion without providing an explanation for such a decision.[28] Where an ALJ fails to sufficiently explain how he reached his decision, the Court may not speculate.[29]

As noted above, the Commissioner's treatment of Dr. McCarthy's opinion has been the subject of several administrative and district court

---

[26] Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990)(noting "the ALJ should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence").

[27] Graham v. Bowen, 786 F.2d 1113, 1115 (11th Cir. 1986); Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).

[28] Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1337 (M.D. Fla. 2003).

[29] Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984).

proceedings. In the present case, unlike the previous proceedings that resulted in remand, the ALJ's decision is informed by Dr. Brown's extensive expert testimony.

In finding that Plaintiff had the RFC for a reduced range of light work, the ALJ gave the greatest weight to Dr. Brown's opinion. The ALJ explained that Dr. Brown had the benefit of reviewing *all* of Plaintiff's extensive records, which reflect an evolving diagnosis. Based on his review and his expertise as a board-certified rheumatologist, and in light of the criteria necessary to establish a diagnosis of lupus, Dr. Brown concluded that Plaintiff's records did not support a diagnosis of lupus. Further, although Plaintiff was diagnosed with a seronegative RA, her x-rays reflected only an early mild degenerative condition in Plaintiff's hands and the medical records did not present evidence of a progressive inflammatory arthropathy. R. 1675-76. Dr. Brown opined that Plaintiff's records supported a conclusion that she had the RFC for light work, with some limitations. As the ALJ found, this opinion is consistent with that of Dr. Zakem, a consulting rheumatologist who examined Plaintiff in

28

December 1998 and also found that Plaintiff could perform light work.  R. 1233.

The ALJ afforded "little or less" weight to Dr. McCarthy's opinion. The ALJ noted that when asked to provide work-related limitations, Dr. McCarthy merely listed Plaintiff's medical conditions.  The ALJ therefore found the opinion conclusory, since Dr. McCarthy did not explain actual work related limitations and did not explain why Plaintiff's conditions prevented her from all work activity.  R. 1233.   Dr. McCarthy's opinion that Plaintiff could not lift heavy items or engage in significant physical exertion was rejected by the ALJ as vague and not correlated to any specific work-related limitations.  R. 1233.

The ALJ further found that Dr. McCarthy's opinion was entitled to little weight because neither Dr. Rozboril or Dr. Miller diagnosed Plaintiff with lupus.  Although Dr. Burnette indicated there could be early lupus, he ultimately diagnosed Plaintiff with seronegative RA, a conclusion that was consistent with Dr. Brown's testimony.  R. 1233.  Dr. Brown's testimony was also consistent with Dr. McCarthy's eventual determination that Plaintiff had UCTD, not lupus.  *Id*.

29

The ALJ acknowledged that with the nature of autoimmune diseases, a correct diagnosis may not be made until some longer period of time has passed and other conditions have been ruled out.  Nevertheless, neither Dr. McCarthy's treatment records nor other examinations established physical limitations or objective findings of a completely disabling condition. The ALJ also was persuaded by Dr. McCarthy's later records documenting Plaintiff's drug-seeking behavior and his opinion that her allegations of pain and symptoms did not correlate to his physical examinations.  R. 1234.

On this record, the Court concludes that the ALJ articulated good cause for not affording substantial or considerable weight to Dr. McCarthy's opinion, given the further assessment of the medical record as a whole by Dr. Brown and the fact that Dr. McCarthy's opinion is not supported by evidence of specific work-related limitations.  Although Plaintiff conclusionally alleges that "other physicians in the 1990's" arrived at the same conclusion that she was unable to work, counsel points to no substantial evidence in the record of specific work-related limitations that were not accounted for in the ALJ's RFC.

## V.  RECOMMENDATION

For the foregoing reasons, it is respectfully **RECOMMENDED** that

the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** this 29th day of June 2017.

*s / Gary R. Jones*

GARY R. JONES

United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations
must be filed within fourteen (14) days after being served a copy
thereof.  Any different deadline that may appear on the electronic
docket is for the court's internal use only, and does not control.  A
copy of objections shall be served upon all other parties.  If a party
fails to object to the magistrate judge's findings or recommendations
as to any particular claim or issue contained in a report and
recommendation, that party waives the right to challenge on appeal
the district court's order based on the unobjected-to factual and legal
conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**